42 C.C.P.A.(Patents)
**Application of John P. SWENTZEL (The Carborundum Co., Assignee).**
**Patent Appeal No. 6025.**

United States Court of Customs
and Patent Appeals.
Feb. 8, 1955.

William H. Webb, Washington, D. C., (Donald A. Gardiner, Washington, D. C., of counsel), for appellants.

E. L. Reynolds, Washington, D. C., (S. W. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before O'CONNELL, Acting Chief Judge, and JOHNSON, WORLEY, and COLE, Judges [original argument before O'Connell, Johnson, Worley, Cole and Jackson (retired), Associate Judges].

WORLEY, Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of claims 5, 6, 9, and 17 to 26, inclusive, of appellant's application for a patent, Serial No. 11,356, for "Silicon Nitride-Bonded Silicon Carbide Articles and Manufacture Thereof." The rejection was based

on lack of invention over the prior art. No claims were allowed.

This matter was first argued January 8, 1954. Our decision was rendered May 27, 1954. Pursuant to the granting of appellant's petition for rehearing, the appeal was reargued on November 12, 1954.[1]

Claims 6, 17, and 20 are considered illustrative of the involved subject matter and read as follows:

"6. A raw batch for the manufacture of bonded silicon carbide bodies, said raw batch consisting of 14 mesh and finer silicon carbide grains, silicon containing ¾% to 1% by weight of iron and having a particle size of 200 mesh and finer and approximately 1% of bentonite.

"17. A bonded silicon carbide article comprising granular silicon carbide and a silicon nitrite bond containing about ¾% to 1% of iron and in which substantially all the silicon of the bond is combined with nitrogen as silicon nitride having the chemical formula $Si_3N_4$, said article being substantially non-staining to white ware and the like at kiln temperatures, having a minimum modulus of rupture at 1350°C. of 2500 pounds per square inch, and being resistant to oxidation and heat shock.

"20. A method of making bonded silicon carbide articles which comprises forming a mixture of silicon carbide grains and finely divided silicon containing ¾% to 1% by weight of iron, the silicon having a particle size of 200 mesh and finer, molding an article from said mixture, drying said article, and firing it in a nonoxidizing, nitrogenous atmosphere at a temperature of 1300°C. to 1400°C. to convert the silicon substantially entirely to silicon nitride having the chemical formula $Si_3N_4$ and thereby bond the silicon carbide particles together."

The references relied on are as follows: Egly 866,444 September 17, 1907; Becket 1,386,227 August 2, 1921; J. W. Mellor (Comprehensive Treatise on Inorganic and Theoretical Chemistry,) 1928, Vol. 8, pages 115 and 117.

Appellant's application discloses a method of manufacturing refractory articles which comprises mixing a batch of silicon carbide grains with fine particles of silicon and a small amount of lignone, wetting the mix with a gel of water and bentonite powder, molding to the desired shape, and heating in a nitrogen atmosphere to a temperature of 1400°C. The temperature is maintained for a number of hours during which a continuous stream of nitrogen is fed over the molded articles. That treatment results in the conversion of substantially all the silicon to silicon nitride which is said to have the formula $Si_3N_4$. The silicon nitride forms an effective bond for the silicon carbide particles, resulting in a strong product having desirable characteristics. The silicon used is a commercial product containing in its impurities iron in the neighborhood of 1% by weight, and is used in the form of a powder which will pass a 200 mesh screen. In some cases an even finer particle size is said to be desirable.

The basic reference relied on in the rejection of the appealed claims is the patent to Egly which discloses the formation of refractory articles by forming a mixture of silicon and silicon carbide which are "mixed as intimately as possible," with the addition of clay if desired, fashioned to the desired form, and heated in an atmosphere of nitrogen. The patentee states that the finished form "contains a considerable proportion of nitrogen combined with the silicon, while the silicon carbid, which in this

---

1. In conformity with the practice of this court, the decision of May 27, 1954 was withheld from formal publication pend-. ing appellant's right to petition for reconsideration. The foregoing opinion is to be substituted therefor.

instance has been mixed with the silicon, has remained unchanged and is strongly cemented by the silicon nitrid to form a dense body." The fineness of the particles and the time and temperature of heating are not specifically stated. The product is said to have "unexpected electrical conductivity" and also "great mechanical, thermal and chemical resistance" and to have a hardness which adapts it for use in articles such as grindstones.

The patent to Becket was relied on by the Patent Office to show that commercial silicon usually contains "1.5–4% of iron."

The Mellor reference was cited to show it to have been known that if silicon is heated in an atmosphere of nitrogen for several hours at a temperature between 1300° and 1400°C. the silicon will absorb nitrogen and be converted to $Si_3N_4$. Mellor also states that finely divided silicon forms the nitride after ten minutes, while the crystaline form requires several hours; and that the electrical resistance of the nitride is "very large."

The claims involved in this appeal are of three types. Claims 5, 6, 9, and 19 are drawn to a raw batch for the manufacture of articles; claims 17, 18, 25, and 26 to bonded articles; and claims 20 to 24, inclusive, to methods of making bonded articles.

In considering claims 5, 6, 9, and 19, it is found that they present three distinctions over what is expressly disclosed by the Egly patent; viz., the use of bentonite as an ingredient, the recitation of iron as being included with the silicon, and the particular size of the grains of silicon carbide and silicon.

While Egly does not specifically mention bentonite as an ingredient of his mix, he does state that clay may be included. Bentonite is a well known clay and there is no showing here that it has any marked superiority to other clays when used in the compositions here under consideration. With respect to that feature, the board stated "We find no issue taken with the contention of the Examiner that Egly's clay is generic to appellant's bentonite, and that both function to bind and plasticize." Appellant alleges no error in the correctness of that statement in his reasons of appeal here.

With respect to the iron content of the silicon, it is noted that Egly does not stipulate that the silicon used in his products must have any particular degree of purity. The use of ordinary commercial silicon would therefore be within the scope of his disclosure and, indeed, would appear to be the most logical material to use in carrying out his process. The fact that commercial silicon normally contains iron is stated in the Becket patent as well as in appellant's specification, wherein reference is made to "the small amount of iron impurity commonly found in the commercial grade of silicon metal." We are of the opinion that the use of silicon containing the amount of iron set forth in the appealed claims is within the purview of the Egly disclosure.

The size of the silicon carbide particles is specified only in claim 6, where it is said to be "of 14 mesh and finer." There is nothing to show that such size is critical, and we think that the selection of particles of that size would be well within the skill of the ordinary worker in the art.

The remaining feature of claims 5, 6, 9, and 19, and the one most strongly relied on here, is the size of the silicon grains, which, in the first three claims, is recited as "200 mesh and finer," which, according to appellant's specification, allows a maximum size of 70 to 90 microns. Claim 19 states that the size of these grains or particles is "less than 20 microns."

Egly does not specify the size of the particles used, but apparently they are in granular form and he states that the materials are "mixed as intimately as possible." Since more intimate mixture is possible with small particles than with larger ones, it would seem that the

quoted language suggests making the particles as small as practicable and, we believe, thus fairly contemplates particles as small as those recited in the appealed claims. Accordingly, even if the claimed particle sizes could be held to be critical, they would not justify the allowance of the claims since, as was said in In re Kepler, 132 F.2d 130, 133, 30 C.C.P.A., Patents, 726.

"A patent should not be granted for appellant's discovery of a result that would flow naturally from the teachings of the prior art."

■ Moreover, it is not considered to have been established that any exact silicon particle size is critical or inventive in the claimed process and product. The lack of criticality is suggested by the fact that some of the claims permit silicon particles as large as 70 to 90 microns while some are limited to 20 microns. This seems to suggest that, within practicable limits, the smaller the particles are, the better the operation will be. We think that is what would normally be expected, especially in view of the Mellor publication which shows that fine particles of silicon are much more quickly nitrided than larger ones. Further, in Table I of appellant's application it is shown that after seven hours of treatment, particles of 180 mesh and finer reflect a gain of 29.45 percent in weight by absorption of nitrogen, and particles of 200 mesh (70 to 90 microns) and finer show a gain of 38.6 percent, while particles of 10 microns and finer gain 58.3 percent after only three and one-half hours. The percentage weight gain indicates the degree of nitriding. The figures in that table indicate a continuing acceleration in the rate of nitriding as smaller particles are used, with no sudden break or change at 200 mesh size. It may well be that the size represents the largest particles suitable for appellant's purpose, but the determination of that desired size under the present circumstances involves nothing more than routine experimentation and exercise of the judgment of one skilled in the art.

We are thus in accord with the board that claims 5, 6, 9, and 19 define nothing patentable over the references cited.

■ Claims 20 to 24, inclusive, which are method claims, recite the firing of a batch such as is defined in the claims just considered, in a nitrogen atmosphere at a temperature of 1300° to 1400° C., to convert substantially all the silicon to silicon nitride having the formula $Si_3N_4$. The Egly patent does not specify the temperature nor the formula of the silicon nitride produced, but merely states that the product will contain "a considerable proportion of nitrogen combined with the silicon." The quoted language suggests that the nitriding is not complete, and the patentee states that his products "have unexpected electrical conductivity" which, as shown by the affidavits in behalf of appellant's application, probably would not be the case if the nitriding were carried to the point specified in the appealed method claims.

As we view the record, the conclusion seems warranted that Egly carries out an incomplete nitriding, resulting normally in a product of relatively high electrical conductivity, while appellant carries the nitriding further and obtains a product considerably less conductive. With respect to that matter, the Board of Appeals held that "We consider it obvious to continue nitriding the molded article at a temperature and for a time sufficient to convert the silicon to the normal nitride, $Si_3N_4$."

We think that holding is sound. The Mellor publication discloses that heating silicon in a nitrogen atmosphere at a temperature including the range specified in appellant's method claims will form the nitride $Si_3N_4$ and that the electrical resistance of that compound "is very large." In view of that disclosure it should be obvious to the skilled worker that continuation of Egly's nitriding, with the use of the small particles, which Mellor shows to be desirable, would result in the production of the nitride claimed here, with a resultant high electrical resistance in the product. Accord-

ingly, to one desiring a product of the kind made by Egly, but with a high electrical resistance, the modification of Egly's product in the manner set forth in the appealed method claims would readily suggest itself.

In view of the emphasis placed by the appellant on high electrical resistance, it seems proper to point out that that feature is not particularly stressed in his application, and that in many of the articles described by him, electrical resistance or lack of it would not seem to have any material significance. That would be true, for example, of abrasives, which are suggested by both appellant and Egly as being one type of article which may be made by their processes.

We are of the opinion that the appealed method claims define nothing more than an obvious adaptation of the Egly process to the production of articles having somewhat different characteristics but not in a patentable sense. Therefore, we think those claims were properly rejected.

The remaining claims are drawn to the articles produced by the method of the claims just considered. The properties ascribed to the articles are those resulting from their method of manufacture and since the method involves no invention over the prior art, the article claims also are held to be unpatentable.

■ The appellant's petition for rehearing, which is limited to the article claims, is based upon the contention that his articles have certain remarkable new properties, namely ability to bear heavy loads at high temperatures, high resistance to heat shock or rapid fluctuation at high temperatures, high refractory qualities, high resistance to oxidation and chemical attack, high electrical resistivity and maintenance of constant volume during nitriding.

This contention would be persuasive if the record contained evidence to show definite superiority of appellant's product over those of the prior art and specifically over that of the Egly patent, which is the basic reference. While appellant's specification contains various statements as to the desirable qualities of his product, there is no evidence from which it can be concluded that Egly's product would not have similar qualities, except in the case of electrical resistivity which, as conceded in appellant's brief on rehearing, "is not a property which is of material significance as regards the uses to which appellant's articles are put."

■ Where unexpected superiority over a reference patent is relied on as the basis for allowance of claims, evidence as to comparative tests between the application and reference is a minimum requirement. Blanchard, v. Ooms, 80 U.S.App.D.C. 400, 153 F.2d 651. No evidence of such tests is of record here, and we must look to the record, rather than to the briefs of counsel for evidence of superiority. In re Burns, 83 F. 2d 292, 23 C.C.P.A., Patents, 1091.

Upon careful reconsideration of this entire case, including the arguments advanced on rehearing, we are of the opinion that the record before us does not justify reversal of the decision appealed from.

Accordingly the decision of the Board of Appeals is affirmed.

Affirmed.

On account of illness, GARRETT, Chief Judge, did not participate in the hearing or decision of this case.