49 CCPA

**Application of William C. RAINER, Edward M. Redding, Joseph J. Hitov, Arthur W. Sloan and William D. Stewart.**

**Patent Appeal No. 6804.**

United States Court of Customs and Patent Appeals.

July 25, 1962.

Alvin Guttag, Cushman, Darby & Cushman, Washington, D. C. (Max C. Louis, Washington, D. C., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for Com'r. of Patents.

Before RICH, Acting Chief Judge, MARTIN and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.*

\* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge

O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 12–14, 16–19, 31–33, 36, and 38–40 in application Ser. No. 517,943, filed June 24, 1955, entitled "Polyethylene." Claims 37 and 41 have been allowed.

Appellants' invention relates to "new cross linked polymers of increased strength and rigidity," and a process for producing such polymers. The process consists essentially of subjecting normally solid polyethylene "in the presence of other non-polar or only slightly polar polymers or ethylenically unsaturated monomers" to high energy radiation of controlled dosage.

As to the nature of a cross-linked polymer, appellants' brief states:

"When a polymer is cross-linked, it has a three dimensional network in contrast to the linear or two dimensional structure of polymers such as conventional, unirradiated polyethylene."

The only other statement in the record explaining what may be meant by polymer cross-linking appears in an article by Harwood et al.[1] It is therein stated under the heading "Crosslinking and Degradation" that:

"Crosslinking is a process whereby two separate long chain molecules become linked together by a primary bond, thereby increasing the average molecular weight and viscosity. When sufficient crosslinks are introduced at random in a specimen consisting of long chain molecules, they form a three-dimensional network, the properties of which can be largely deduced on theoretical grounds."

As background to their invention, appellants state, "It has previously been proposed to cross-link polyethylene by high voltage irradiation to render the polyethlene more rigid." It is because attempts "to cross-link other polymers by irradiation * * * have not been uniformly successful" that appellants consider unobvious their claimed process and product which require that certain enumerated polymer-polymer or polymer-monomer admixtures become cross-linked when irradiated. As an example of what happens to these "other polymers" appellants state:

"* * * materials, such as plasticized cellulose acetate, Butyl rubber (isobutylene-isoprene or butadiene copolymer), deteriorate when irradiated with a 2 mev electron beam in a dosage 20 X $10^6$ REP [2] at room temperature."

Claims 19 and 31 are exemplary of the claims before us and read as follows:

"19. A cross-linked copolymer prepared by irradiating at a dosage of at least about 2 x $10^6$ REP a mixture of normally solid polyethylene and a hydrocarbon polymer containing a plurality of isobutylene units.

"31. A process comprising irradiating normally solid polyethylene at a dosage of at least about 2 x $10^6$ REP admixed with a material selected from the group consisting of hydrocarbon polymers containing a plurality of isobutylene units, a liquid partially depoly[m]erized rubber, a liquid butadiene styrene copolymer, a liquid butadiene acrylonitrile polymer, a polymerizable ethylenically unsaturated hydrocarbon monomer other than ethylene, halogenated styrene, alkyl acrylates, alkyl methacrylates, N, N-methylene-bis-acrylamide, dialkenyl oxalates, diallyl phthalate, ethylene glycol di-

---

1. "The Effects of Radiation on Materials," Reinhold (1958).

2. Appellants' specification says: "A REP, as is recognized in the art, is defined as that amount of nuclear radiation which dissipates 93 ergs of energy per gram of tissue producing 1.61 X $10^{12}$ ion pairs in the process. It is approximately equal to the amount of energy that would be dissipated by a one roentgen X-ray beam in a gram of tissue." The examiner stated in his answer that "1 Roentgen equals 1.1 REP."

methacrylate, triallyl cyanurate, diallyl maleate, diallyl fumarate, triallyl melamine, dialkyl maleates and dialkyl fumarates to form a cross-linked polyethylene copolymer."

As to the criticality of the "at least about 2 x $10^6$ REP" radiation *dosage,* appellants' specification states:

"It has generally been found that a dosage level of 2 X $10^6$ REP is necessary to obtain a significant increase in strength and toughness of the product. At 6 X $10^6$ REP, the improvement is pronounced. In ascending order of dosage, these properties are progressively enhanced, being quite good at 20 X $10^6$ REP. Increasing rigidity is also noted, being quite pronounced by 20 X $10^6$ REP. In fact, about 50 X $10^6$ REP, it becomes difficult to mold the products by conventional molding techniques and it is necessary to resort to pressure and vacuum post forming at dosages from 50 to 100 X $10^6$ REP. At dosages of 200 X $10^6$ REP and above, a permanent amber tint is imparted to products made from a substantial proportion of polyethylene.

\* \* \* \* \* \*

\* \* \* With polyethylene having a molecular weight of 7,000, it is necessary to employ a dosage of at least 100 X $10^6$ REP in order to get satisfactory cross-linking and even higher dosages are necessary for lower molecular weight polymers. Correspondingly lower dosages can be employed to obtain cross-linking of higher molecular weight polymers."

Appellants' specification also indicates that irradiation *voltage* is a pertinent consideration when it states:

"The polyethylene-polymer or monomer blend can be irradiated at a thickness of from 3 mils or less (e.g., 1 mil), up to 100 mils or even higher, e.g., 250 mils, but is preferably about 40 to 50 mils. For thicknesses above 250 mils, the voltage should be above 2,000,000 and can be 3,000,000 or 6,000,000, or even higher. The lower limit of the voltage also is not particularly critical and can be 750,000 or below. In any event, the voltage should be sufficiently high to induce the cross-linking necessary to give the desired increase in strength."

Product claims 19, 32 and 38 and process claims 31, 33, and 36 stand rejected as being unduly broad. The basis, in part, for the examiner's holding of undue breadth, which was most clearly stated in his rejection of claims 31, 33, and 36, was:

"\* \* \* determining the *energy level* limits for the radiations is considered to be a reasonable requirement. Appellants must know or have determined the radiation energies which yield the desired crosslinking \* \* \*, and therefore, *they should specify at least the minimum operative energy level* in the claims in order to define the radiations. A recitation of the minimum operative energy level in claim 36 would render it acceptable." [Emphasis ours.]

The board affirmed this portion of the examiner's rejection, but did so primarily on the basis of a portion of the Harwood et al. article, supra, which stated "the major reactions in polymers \* \* \* depend primarily on the total energy absorbed and sometimes on the radiation intensity \* \* \*." The board then proceeded to hold these claims unduly broad "in failing to include the intensity of the radiation required."

■■ We feel that the board's reliance on Harwood et al. to support a rejection of these claims as unduly broad is untenable for two reasons.[3]

---

3. We see no error in the limited use the board has made of the Harwood et al. article notwithstanding it was published approximately two and one half years after appellants' filing date, i. e., to show that appellants' claims are *unduly broad.*

The examiner's undue breadth rejection also stated that the claims were "in-

First, in the same paragraph where Harwood et al. state that "sometimes" radiation intensity affects polymer reaction, it is stated that

"* * * *in the crosslinking of polyethylene* or silicones, the density of crosslinking is found to depend *only* on the energy absorbed per gram and *independent* of whether this is due to highly penetrating gamma rays absorbed at a rate of about 1 Mrad a day, to mixed radiation from an atomic reactor providing radiation at an *intensity* of some 3 Mrads/hour or 2 MeV electrons of low penetration (about 6 mm) at a much *higher rate* of about 1 Mrad/second." [Emphasis ours.]

Harwood et al., therefore, when referring to polyethylene, clearly state that one aspect of crosslinking, i. e., density, depends "only" on energy absorbed per gram and *not* on "intensity" as Harwood et al. used this word, i. e., as an indication of the *rate* or quantity of radiation absorption per unit of time.[4] There is no indication in Harwood et al. that, *as to polyethylene or polyethylene-polymer or monomer mixtures, any* radiation crosslinking reaction is dependent on radiation intensity, as the board assumed there was.

Secondly, as just indicated, Harwood et al. used the word "intensity" to indicate the *rate* at which radiation is absorbed. Nowhere in appellants' specification do we find any suggestion that in their process radiation absorption *rate* is critical. Under such circumstances we cannot see how a failure to indicate radiation "intensity," i. e., *rate*, in these claims renders them defective.

We turn then to the portion of the examiner's undue breadth rejection affirmed by the board, i. e., to the fact that these claims do not recite any particular *energy level* (voltage). We note that none of these claims includes reference to either polyethylene-polymer or monomer blend thickness or to any specific polyethylene molecular weight. In the absence of such factors, appellants' specification merely states, as previously noted, that "The lower limit of the voltage also is not particularly critical and can be 750,000 or below." The examiner indicated that these claims would not be considered unduly broad by the Patent Office if they stated the "minimum operative energy level." The second paragraph of 35 U.S.C. 112 requires that an applicant particularly point out and distinctly claim his invention. We think it is clear that minimum energy level is neither critical nor a significant aspect of the invention here. It would not serve to distinguish from the prior art. In sustaining this undue breadth rejection, the board said:

"In the *practice* of the invention * * * reliance merely on total dosage [which is in the claims] would involve *extensive experimentation for ascertaining practical limits*

definite with respect to the type of radiation claimed." Appellants cited the Harwood et al. article to show that reactions in polymers are not dependent on the type of radiation or its source. The board agreed with appellants in this respect but noted, for reasons discussed infra, that the Harwood et al. disclosure strengthened the remainder of the examiner's undue breadth rejection. If the examiner ever considered the Harwood et al. article, this fact does not appear in the record.

4. That Harwood et al. used the word "intensity" in this sense is clear from their reference to "an intensity of some 3 Mrads/hour" and a "rate" of about

1 Mrad/second." Clearly, Harwood et al. are using the words "rate" and "intensity" interchangeably here. We note also that Harwood et al. use the words "intense" and "intensity" in a *rate* sense when they state:

"Electronic sources of radiation are particularly suitable for providing very *intense* beams of electrons concentrated on a small area. Radioactive sources, on the other hand, can be used more conveniently to expose larger areas giving lower *intensity* sources; the same dose can then be accumulated over a long exposure time, and more material can be irradiated at any one time." [Emphasis ours.]

*of operation.* We are therefore in agreement with the holding of the examiner that the claims fail to define the process for obtaining the desired polymerizations *adequately,* in failing to include the *intensity* of the radiation *required.*" [Emphasis ours.]

It appears to us that the board is here confusing the requirements for claims with the function of the specification. One does not look to claims to find out how to *practice* the inventions they define, but to the specification. Here the "practical limits of operation" are sufficiently set forth in the specification so as to eliminate any need for "extensive experimentation." Minimum energy level does not appear to us to be part of appellants' invention but rather something which would be obvious from the prior art and we do not consider the claims to be unduly broad in omitting it. We cannot sustain the rejection of claims 19, 31–33, 36 and 38 as unduly broad. This was the sole remaining ground of rejection of claims 19, 33 and 36.

■ The Patent Office has further rejected process claims 12–14, 16–18, 31, 39 and 40 and product claims 19, 32 and 38 [5] as unpatentable over:

Lawton et al., "Nature," Vol. 172, pages 76 and 77, July 11, 1953.

Claim 31 may be taken as exemplary for the purpose of discussing this rejection. Process claims 12–14, 16–18 depend either directly or indirectly therefrom. Claim 32 calls for a product made according to the process of claim 31. Claim 38 is like claim 32 but is in independent form and defines the product as a "flexible bag." Independent claim 39 is similar to claim 31 but calls for a radiation level of "at least about 750,000 electron volts." Claim 40, dependent on claim 39, specifies the "material" which is ad-

mixed with polyethylene to be a "polymerizable ethylenically unsaturated hydrocarbon monomer.

Lawton et al. disclose that:

"The interaction of high-energy radiation with various forms of matter has been shown to produce a variety of chemical effects, depending upon the system. These effects fall into various classes, among which are oxidation and reduction, polymerization and depolymerization. * * *

"Our work in this field has been with high-energy electrons, such as are produced by a resonant transformer-type cathode ray equipment, which supplied electrons having peak energy of 800 kV. We have covered a dose-range from below one million to several hundred million röntgen units. * * *

"We have made measurements of solubility, swelling, gas evolution and physical properties on a large number of polymers irradiated with our equipment. These polymers fall into two classes: those that become degraded and those that become cross-linked. The accompanying table lists some of the polymers investigated."

Under the heading "Polymers becoming cross-linked" Lawton et al. list, inter alia, polyethylene, natural rubber, GRS, and butadiene-acrylonitrile copolymers. They also state:

"A number of other polymer mixtures, co-polymers, and polymer-monomer mixtures have also been found to become cross-linked as a result of irradiation. * * *

"The polymers that were found to become cross-linked appeared to behave as would be generally ex-

5. There appears to be some confusion as to whether claims 32 and 38 stand rejected over Lawton et al. The examiner, in his answer, clearly did reject these claims on this basis. The board having affirmed that part of the examiner's answer which dealt with the Lawton et al. reference, we feel that its failure to refer specifically to claims 32 and 38 in this regard was inadvertent. It is clear that the board intended to affirm the examiner as to all claims against which he had applied the Lawton et al. reference.

pected for a cross-linked material. They were no longer soluble in solvents for the unirradiated material; They showed improved form-stability at elevated temperatures; the tensile strength and ultimate elongation changed upon irradiation; and they for the most part changed from plastic to elastic substances."

The Patent Office position with respect to Lawton et al. and claim 31 was thus stated in the examiner's answer:

"Lawton et al disclose that the irradiation of many polymers by high energy electrons results in cross-linked polymers. Among the polymers becoming cross-linked as disclosed by Lawton et al are polyethylene, natural rubber, and butadiene-acrylonitrile copolymers all of which are claimed by appellants. Lawton et al also disclose that a number of polymer mixtures were found to cross-link as a result of irradiation. In view of this disclosure, it is considered within the ordinary skill of the art to mix two or more polymers which Lawton et al disclose to cross-link separately and find that the mixture cross-links."

The solicitor expands the examiner's statements in saying:

" * * * Lawton et al. fully and clearly teach the irradiation of polyethylene with more than one of the substances recited on [in] the Markush group of illustrative claim 31 or equivalents thereof, such as natural rubber, GRS and butadine-acrylonitrile copolymers. These substances are the full equivalents of the corresponding liquid polymer materials recited in the Markush group of claim 31 and nothing of a critical nature is disclosed in the use of liquid polymers, especially since the specification indicates that solid polymers or copolymers may be mixed with the polyethylene * * *."

6. A footnote to appellants' brief explains what a graft copolymer may be. It states:

Appellants argue that the polymers mentioned in Lawton et al. are not part of their Markush group in claim 31 mainly because the *liquid* polymers recited therein are of much lower molecular weight than the solid polymers mentioned in the Lawton et al. reference.

We think that the Patent Office position with respect to claim 31 is correct. Appellants' specification clearly does not establish that the molecular weights of the constituents of their Markush group are critical. The opposite is actually true. In particular we note that appellants' specification specifically states that "natural rubber" can be used as a "modifying polymer" along with polyethylene. Even if polymer molecular weights are critical, we note that Lawton et al. disclose that samples of polyethylene from molecular weight "2,100 to 24,000 have been irradiated." We find that it would be obvious, accordingly, for one skilled in the art to irradiate other polymers disclosed by Lawton et al. over a wide range of molecular weights. It is particularly because Lawton et al. indicate that "a number of other polymer *mixtures* * * * have also been found to become cross-linked as a result of irradiation [emphasis ours]," that we think it would be obvious to one skilled in this art, if additional cross-linked products were desired, to mix and irradiate various combinations of polymers of varying molecular weights which Lawton et al. disclose will individually cross-link under irradiation.

Appellants consider the Lawton et al. disclosure inapposite for the additional reason that "nowhere does Lawton [sic] disclose making any specific graft copolymer [6] of any two polymers." In answering this argument the solicitor states:

"Insofar as the appellants rely upon the assertion that the claimed process results in tougher *graft* polymers, it should be noted that the disclosure in the specification (R–4–7)

"A graft copolymer is a combination of polymers in which there is a main chain made up of one polymer and attached to

does not clearly state that all of the members in the Markush group of illustrative generic claim 31 (R–106) will form *graft* copolymers \* \* \*. [Initial emphasis ours.]"

We believe that the solicitor is correct in this contention. We note in addition that whatever specific problems or advantages may be attributable to *graft* polymerization, all of the claims before us specifically require that a *cross-linked* polyethylene copolymer be formed.

In summary, we feel that in claim 31 appellant has merely defined the production of a cross-linked polyethylene copolymer by:

(1) admixing normally solid polyethylene, which Lawton et al. disclose will cross-link, with a material selected from a Markush group several members of which would be considered by one skilled in this art obvious constituents for such an admixture; (2) irradiating this admixture with an unspecified type of radiation which could be high energy electrons, disclosed by Lawton et al. to be a type of radiation suitable for polymer irradiation, at a dosage ("at least about $2 \times 10^6$ REP") well within the dosage comprehended by Lawton et al. ("from below one million to several hundred million röntgen units," where one Roentgen equals 1.1 REP); (3) forming, as Lawton et al. indicate will be formed, a cross-linked product by such irradiation of the admixture.

What we have said with respect to claim 31 is deemed sufficient basis for affirming the Patent Office rejection with

respect to claims 12, 13, 16–18, 38, and 39, inasmuch as neither the Patent Office nor appellants have argued the patentability of these claims separately.

Appellants' main argument with respect to claim 32 (the product made by the process of claim 31) is that the board did not reject product claim 32 on Lawton et al. We have already answered this argument.[7] Furthermore, as just indicated, we find the process of claim 31 unpatentable because it would be suggested to one of ordinary skill in the art by the Lawton et al. disclosure, which would also suggest the resulting product.

Claim 14 recites a "free radical engendering substance" to "aid in the cross-linking." We think appellants' arguments concerning the patentability of this added limitation are amply controverted by their own specification which states:

"While it is not essential to use an additional catalyst, it is frequently desirable to add a free radical engendering material to hasten the cross-linking \* \* \*. *Conventional materials can be employed* \* \* \*." [Emphasis ours.]

Merely reciting the use of a "conventional material" in a claim to a process to perform its conventional function will not render patentable an otherwise unpatentable claim.

Claim 40 is the last claim for consideration. Dependent on claim 39, it specifies that the material admixed with the polyethylene during irradiation be "a polymerizable ethylenically unsaturated hydrocarbon monomer."[8] The board, in

---

the main chain are branches of another polymer. If the main chain is composed of units A then the graft copolymer of B to A may be represented by the structure

$$\begin{matrix} B \\ B \\ B \\ -AAAAAAA-. \\ B \\ B \\ B \end{matrix}$$

It differs from a conventional copolymer of A and B in that the conventional copolymer can be represented by the structure –ABABABAB–."

**7.** See footnote 5, supra.

**8.** Appellants' brief erroneously states that claim 40 is dependent from claim 31 and also, in writing claim 40 in independent form in their brief, fail to complete it by including the final process clause of claim 39.

considering appellants' request for reconsideration, said:

"\* \* \* we find no reason for concluding that Lawton et al., in stating that "polymermonomer mixtures have also been found to become cross-linked", following the listing of polymerizable materials, would exclude a broad class of *monomers commonly employed for cross-linking,* as defined in claim 40." [Emphasis added.]

The examiner in his answer similarly stated:

"\* \* \* the monomers claimed by appellants are known to polymerize by conventional thermal processes and irradiation processes, and many of them are well known cross-linking agents \* \* \*."

Appellants' brief quotes in part the above portion of the board's opinion and says:

"*There is no art of record and applicant's know of no art prior to applicants' filing date which shows any method of grafting any 'monomers commonly employed for cross-linking' to polyethylene.*"

Here again we find appellants' emphasis on "grafting" inapposite. We have only appellants' allegation before us that "the problems involved in *graft* polymerization of a monomer to polyethylene are completely different from those of simply copolymerizing monomeric ethylene and another monomer." (Emphasis ours.) Even were we to hold that the record establishes that what appellants contend is true, we are faced with the fact that *this claim* does not refer to *graft* polymerized polyethylene and a monomer but instead, by dependency on claim 39, to a "cross-linked polyethylene copolymer," which is exactly what the Lawton et al. disclosure is directed to. As the record stands before us, we find that appellants made no effort to controvert the board's or the examiner's statements that appel-

lants' claim 40 process monomers are well known *cross-linking* agents.

For completeness, we will answer appellants' final argument which goes to the use of Lawton et al. as a reference against any of their claims, namely, that the Lawton et al. disclosure that "polymer-monomer mixtures have also been found to become cross-linked as a result of radiation" is nothing more "than an invitation to lengthy experiment."

Lawton et al. do not disclose any specific monomer as being capable of cross-linking under radiation. We find ourselves unable, however, to ignore the Lawton et al. teaching that some polymer-monomer mixtures will cross-link as a result of irradiation. When claim 40 is analyzed, it will be seen that appellants are not claiming therein any particular polymer-monomer mixture. As the claim stands, it recites that what appears to be a broad group of monomers, when admixed with polyethylene and irradiated, will result in a cross-linked product. While appellants argue that this group is not, in fact, broad, we find ourselves faced with statements to the contrary made by the Patent Office, which statements furthermore indicate that these monomers are of the type commonly designated "cross-linking agents."

We feel, accordingly, that one skilled in the art, presumed to know the Lawton et al. disclosure, that some polymer-monomer mixtures will cross-link under irradiation and also knowing that appellants' claim 40 monomers are common cross-linking agents, would consider it obvious to form a cross-linked polyethylene copolymer in the manner and from one of the possible constituents within claim 40.

For the foregoing reasons: (1) the rejection of claims 19, 33 and 36 is reversed; (2) the rejection of claims 12–14, 16–18, 31, 32, 38, 39 and 40 is affirmed.

Modified.

WORLEY, Chief Judge, did not sit or participate in decision.