50 CCPA
**Application of Christopher L. WILSON and Robert Lieberman.**
Patent Appeal No. 6858.
United States Court of Customs and Patent Appeals.
Dec. 12, 1962.

George B. Finnegan, Jr., and Hobart N. Durham, New York City (John C. Vassil, New York City, of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

RICH, Judge.

This appeal is from the affirmance by the Patent Office Board of Appeals of the examiner's rejection of claims 1, 2, 4, 6, 7, 10, 11 and 12 of appellants' patent *application* Ser. No. 451,703, filed August 23, 1954, for "Process of Making Foamed Polyester Materials."

The invention is a method of making what are now known as polyurethane foam products. Appellants' specification acknowledges that such products and processes of making them were known prior to their invention and that the foam product results from reacting a polyester resin, an organic diisocyanate, and water. A catalyst is used to speed up the reaction, which is exothermic and generates carbon dioxide gas. The gas acts as a blowing agent and turns the viscous liquid mass into foam. The mass sets to a rubbery consistency and the product may be used for cushioning and other uses.

Appellants' invention is a very specific detail in an otherwise old process for producing an old product. They say that they have discovered an improved method, which produces a product "having a predominantly open cell structure" wherein the bubbles or cells of the foam mostly intercommunicate, as distinguished from "discrete cells" which are not intercommunicating.

The improvement, which appellants' brief contends brings about this result, resides in the sequence and timing of mixing steps. First, the polyester, isocyanate, and catalyst are mixed; second, quoting claim 4, is the step of "permitting the mixture to react for from 30 seconds to about 10 minutes, at initial temperatures up to about 30°C [86°F.]"; and finally, "then adding a small amount of water to the mixture and permitting further reaction, whereby a foamed product is formed."

The gist of the alleged novelty in the invention is the permitting of the ingredients, except the added water, to *react* for at least 30 seconds before the water is added. Although the claims put a top limit of 10 minutes on this period, it appears to have no particular significance in the light of the disclosure which contains specific examples of the production of foams with intercommunicating "pores" or "holes" including reaction times of 15 minutes and 30 minutes, before the water is added. Furthermore, the specification states, "The optimum period of time permitted to elapse before the water is added, varies with the resin and di-isocyanate used but is always longer than 30 seconds." It thus appears that it is the 30 second minimum which is significant in "pointing out" the invention as required by 35 U.S.C. § 112, if anything in the claims is.

The specification thus describes what appellants believe *to be happening in their process:*

"In the present process, it is believed that the premixing of all of the ingredients except the water and permitting to stand *for a definite minimum period* of time before adding the water, is desirable to cause a lengthening of the molecular chains *which result from the resin-isocyanate reaction.* The addition of the water is believed to cause *further chain lengthening* in addition to foaming." [Emphasis ours.]

It appears that there are two reactions, first, that between the polyester resin and isocyanate, and finally the reaction with the added water. Apparently the first reaction is supposed to affect final cell structure independently of the second reaction but there is no explanation of why this should be so. The specification continues:

"After the water is added, the foam cells which are formed are, at first, all discrete. These cells then partially break down into one another as the reaction proceeds so that the final structure resembles a mass of small cells which are connected only at certain places on their spherical, or almost spherical

surfaces, and only over small areas compared to the total surface area of the original cell. This conversion usually occurs within one to two hours but, in some instances, may not do so for periods as long as two days."

For the sake of completeness it may be stated that the proportions of poly-ester resin and diisocyanate are about 30 g. of resin to from 6 to 11 g. isocyanate. The "small amount" of water that would be added to such a quantity of resin-isocyanate product (known as a "prepolymer") would be "about 0.5cc," which is half a gram, as shown in each of the 22 examples.

The references relied on are:

| | | |
|---|---|---|
| Windemuth | 2,650,212 | Aug. 25, 1953 |
| Hoppe et al. | 2,764,565 | Sept. 25, 1956 |
| German Patent | 860,109 | Dec. 18, 1952 |

Also cited, not as prior art, but as a "teaching reference" to show a *fact* with respect to polyurethane foams, is:

"Urethane Resilient Foams Made from Polyesters," prepared by W. J. Remington and R. H. Walsh, Du-Pont Elastomer Chemicals Department, bulletin HR–10, Feb. 15, 1956.

The Hoppe et al. and German patent references will first be disposed of. The board proceeded on the assumption that the examiner rejected all claims as unpatentable over each of the above patent references separately (it is not at all clear to us that he did, but we do not have the entire file before us)[1] and then declined to sustain such a rejection on the Hoppe et al. or German patents, saying of them:

"The two references under discussion, are in our opinion, only of pertinence to show that the react-ants claimed are well known in the art for purposes of making foamed polyurethane resins. The rejection of the claims thereon is not sustained."

We shall take the same view of their pertinence the board did. Any rejection based on them, having been reversed, is not before us.

█ The DuPont publication, the date of which is later than appellants' filing date, was cited by the examiner for the following passage:

"The structure of urethane foams is such that most of the cells are interconnecting. Tests indicate that less than 5% of the cells are closed. Foams with predominantly closed cells can be made by proper modification of the foaming formu-la."

The board considered that the publication was properly cited to show a state of fact. After reading the entire publication, so do we. It clearly is a discussion of the properties of polyurethane foam products generally, products made by the processes of the prior art of record in this case. Appellants have made

1. The examiner's own version of his rejection as set forth in his Examiner's Answer is that the claims here on appeal "stand rejected as unpatentable over Windemuth, Hoppe et al and the German Patent." On the other hand, the board said that the claims "stand rejected as unpatentable over any one of Windemuth, Hoppe et al, and German patent 860,109." The record here contains none of the office actions other than the final rejection which states the rejection in the words of the Examiner's Answer but adds "for the reasons set forth in paragraphs 3 to 5 of the last office action." If the board had reason for its version of the examiner's rejection, it is unknown to us but we would normally expect the Answer to be the examiner's final opinion and to supplant any previous reasons given.

no effort to refute the fact for which it was cited, contenting themselves with the contention that we cannot rely on the publication for any reason. At the same time they admit that the two techniques disclosed in the bulletin for making polyurethane foams were known when appellants filed their application. While they argue, too, that it contains no suggestion of their process, that contention is entirely beside the point, since the bulletin was not cited as a prior art reference or as suggesting the claimed invention. As evidence of the characteristics of prior art foam products, however, we know of no reason in law why it is not acceptable.[2]

The sole outstanding rejection of the examiner affirmed by the board is, therefore, that the appealed claims are unpatentable over the Windemuth patent and the sole basis of the argument to the contrary is the claim recitation that the polyester-isocyanate-catalyst mixture is allowed to "stand," as some claims say, or to "react" as other specify, for at least 30 seconds and up to about 10 minutes, or for specified periods of 1.5 and 4 minutes within that range recited on other claims, before water is added to it to make it foam.

Claim 4, a "reaction" claim, is exemplary and reads as follows:

"A method of making an open cell, resilent foamed polyester resin material comprising mixing together a polyester resin which is the reaction product of a glycol selected from the class consisting of di-, and polyethylene glycols and an aliphatic dibasic acid containing 2 to 8 carbon atoms and 0 to 2 nonadjacent ether oxygen atoms in the chain between the carboxyl groups, said resin having an acid number of up to 20 and a hydroxyl number of about 20 to 100, an organic di-isocyanate and a tertiary amine catalyst, said resin and di-isocyanate being in the ratio of 30 g. of resin to about 6–11 g. di-isocyanate permitting the mixture to react for from 30 seconds to about 10 minutes, at initial temperatures up to about 30°C, then adding a small amount of water to the mixture and permitting further reaction, whereby a foamed product is formed."

Windemuth discloses what he terms "diisocyanate modified polyesters," stating that they are produced by *reacting* an aliphatic diisocyanate with a polycarboxylic acid polyester. Such product, he says, can be mixed with a catalytic amount of a tertiary amine. Appellants do not dispute that these are reactants and catalysts within their claims. Windemuth then goes on to say:

"The resulting mixture is completely stable under perfect exclusion of water. Such mixtures may be stored for months and even years without any change. In the presence of water, however, the solutions are converted at normal temperatures in an exothermic reaction with the formation of carbondioxide into macromolecular plastics which may have an elastic character depending upon the composition of the polyesters employed as starting materials."

The reference is here speaking of a diisocyanate-modified polyester which has been produced under anhydrous conditions, so that there is "perfect exclusion of water," and so that there is obtained a polyester-isocyanate-catalyst composition which *can* be kept for long periods and then reacted with water, whenever desired, to make some product or used in other ways, for example, as adhesive. In several examples the reference points out how the anhydrous mixture will react further when brought into contact with moisture in the air which, in from 20 to 30 minutes, the catalyst being present, will start to change from a viscous liquid to a rubber-elastic state.

2. In this regard, see also In re Rainer et al., 305 F.2d 505, 49 CCPA ——, particularly at note 3 and accompanying text.

Appellants make much of Windemuth's supposed emphasis on his long-keeping anhydrous mixture (which is all he claimed), emphasizing that their materials (though they are not so disclosed in their specification) inherently contain some water because no effort has been made to make them anhydrous. Appellants' claims are entirely silent with respect to any water contained in the polyester, diisocyanate, or catalyst. It is not at all clear to us, in any event, that water is necessarily involved in the "reaction" which is supposed to take place during appellants' 0.5 to 10 minute "standing" period of the claims. In the passage we have quoted above from appellants' own specification, the reference is to the "lengthening of the molecular chains which result[s] from *the resin-isocyanate reaction*." (Our emphasis.) The specification says immediately thereafter, "The *addition* of the water is believed to cause *further* chain lengthening in addition to foaming." (Our emphasis.)

Windemuth also describes his *anhydrous* diisocyanate-modified polyester as produced by "the reaction" of diisocyanate and polyester and then refers to "said reaction product." We are not able to find any basis in the claims, in appellants' specification, or in the Windemuth disclosure for saying that there is a distinction between the reaction assumed to take place in the first 30 seconds of appellants' claimed standing period and the reaction which takes place in Windemuth's preliminary reaction, prior to storage or prior to deliberate water addition, even where Windemuth is using anhydrous reactants.

But there is more to Windemuth's disclosure, for he describes the making of cellular products, on which disclosures the Patent Office relies. The first description is this:

"Compact self-hardening masses may also be produced by mixing the isocyanate modified polyester containing the catalyst with fillers containing water. Numerous inside surfaces exuding water are formed thereby, which enable the originally liquid mass to solidify. *The products obtained in this manner are filled with bubbles*, so that it is possible to produce *cellular materials of varying porosity*." [Emphasis ours.]

Example 7 describes the making of "a polyesterisocyanate" from diethyleneglycol, adipic acid and hexamethylene-diisocyanate, mixed with catalyst. This corresponds to appellants' claimed three-component premix combination. The example says nothing about anhydrous conditions in the mixing of these three ingredients which are *next* mixed with "ten parts of its [the polyesterisocyanate's] weight of mechanical wood pulp." The description of the example concludes:

"The components are well mixed and then cast into the desired mold. An elastic cellular material is formed with an enlargement of the volume within 15–20 minutes."

In appraising this reference, the board, referring to the claim limitation of 30 seconds to 10 minutes relied on for patentability, and speaking of the effect of the Windemuth reference, said:

"It appears to us that this interval is the only feature in appellants' claims which is not fairly taught by the reference. However, we are in full agreement with the examiner that since Windemuth points out that water can be added *at any time* after the reaction mixture had been formed, or stored, there *can not be* any invention or *anything unobvious in adding the water in the interval of 30 seconds to 10 minutes after* the reaction mixture had been made. The examiner believes that this would fall within the scope of the Windemuth process. It seems to us that if there is any criticality in this interval, as distinguished from longer periods of storage under anhydrous conditions, it was incumbent upon appellants to establish this by comparative evidence, In re Swentzel et al., 42 CCPA 757, 1955 C.D.69, 692 O.G. 269, 219 F.2d 216, 104 USPQ 343." [Emphasis ours.]

Our understanding of the board's position is that Windemuth discloses a "reaction mixture" which has undergone a reaction prior to the deliberate addition of water as the next step, which meets the terms of the claims as to ingredients. In a short opinion after a request for reconsideration, the board pointed out that "There is nothing in the claims which requires the presence of moisture in the premix hence no distinction from Windemuth can arise on this score." So it appears to us that the board felt that, pursuant to Windemuth's teaching, the water can be added anytime and there is nothing unobvious, and hence nothing patentable, in adding it in the particular interval of 30 seconds to 10 minutes after making the premix. We are in complete agreement with that reasoning. Indeed, it seems to us that in carrying out the process in the sequence indicated by Windemuth it would be entirely normal to get the water in somewhere between a half minute and 10 minutes after making the premix, though one might have to hurry to get it in within 30 seconds.

Appellants put so much emphasis on Windemuth's teaching that the premix *can* be made under anhydrous conditions and stored successfully *if* water is excluded that they seem to overlook the fact that it is clearly taught by the reference that if there is no desire to store the premix for long periods it need not be made and maintained under anhydrous conditions. Windemuth gives 7 specific examples. Three of them describe processes involving drying of the ingredients but the other four examples make no mention of drying. In every instance in Windemuth where water is added to the polyester-isocyanate-catalyst premix it is added *after* the premix is formed, just as in appellants' process, and the polyester and isocyanate have been previously reacted. When appellants' application was written, this process was distinguished by them from acknowledged prior art processes wherein the three ingredients of the above premix *and the water* were all mixed together *at the same time*. The featured inventive improvement thereover was to hold out the water for at least 30 seconds and, according to the examples, up to as much as 30 minutes, notwithstanding the present claim limitation to 10 minutes, which seems to be meaningless when considered in the light of the specification.

We appreciate that Windemuth does not specifically teach the making of a polyurethane foam in the absence of a filler.

We believe, nevertheless that one skilled in the art with the knowledge of the prior art processes acknowledged in the specification and with the knowledge of the Windemuth disclosure would find nothing unobvious in merely adding water without at the same time adding filler.

We are also in full agreement with the Patent Office that it was incumbent on appellants to show the factual existence of any advantage to be derived from their invention, on which they rely for patentability. Not only is there no evidence in the record before us that the claimed process produces a foam product with a *greater* proportion of interconnected cells, but we find the specification quite baffling on this score. The acknowledged prior art processes are said to produce "a mass of small cells most of which were connected. The material also contained a certain proportion of discrete cells, however." The discovery is said to be of a process for making "foamed polyester resinous material having a predominantly open cell structure." Only 8 of the 22 examples undertake to describe the cell structure and not one of them mentions the all-important ratio of discrete to connected cells, pores or holes. It is at this point that the disclosure of the DuPont bulletin becomes significant for its disclosure that in polyurethane foam products in general most of the cells are interconnecting, tests indicating that only 5% are discrete or closed cells. The advantageous feature on which appellants endeavor to predicate patentability is, therefore, at least suspect as possibly not in the least due to any process improvement which they have

disclosed. With no evidence to back their claim, it is indeed a weak reed on which to lean.

Another source of bafflement with respect to the allegedly significant minimum 30 second standing or reacting period of the claims is Example 2 of the specification wherein the standing time is 4 minutes. Referring to this and also to Example 1 wherein the time was 1.5 minutes, is the following paragraph:

"As a check, the procedure of the above examples was repeated but the premix without the added water was allowed to stand for only one minute before adding the water. The product that was formed had predominantly a discrete cell structure."

Evidently 30 seconds of standing is not enough in some circumstances and, as a claim limitation "pointing out and distinctly claiming the subject matter which the applicant regards as his invention," it does not seem to have significance, in the light of appellants' disclosure, as a critical factor.

The decision of the board is found to be without error and is affirmed.

Affirmed.