53 CCPA

### Application of Sanford C. LYONS.

### Patent Appeal No. 7609.

United States Court of Customs and Patent Appeals.

Aug. 25, 1966.

Rehearing Denied Oct. 6, 1966.

Smith, J., dissented.

Eugene F. Buell, Pittsburgh, Pa., for appellant.

Joseph Schimmel, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for the Commissioner of Patents.

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.[*]

MARTIN, Judge.

This is an appeal from a decision of the Board of Appeals affirming a double patenting rejection of claims 29–33, the only remaining claims in Lyons' application serial No. 764,395, filed September 30, 1958 for "Kaolin Product and Process for Making Same."

From the context of the rejection and decision it is clear that the double patenting rejection is of the obviousness type, being based on the claims of appellant's prior patent:

Lyons      2,904,267      Sept. 15, 1959
           (filed September 16, 1957),

in view of a patent to

Billue      3,058,671      Oct. 16, 1962
            (filed May 18, 1959 as a continuation-in-part of serial No. 611,757, filed Sept. 24, 1956, now abandoned).

Claims 29–32 are drawn to a process and claim 33 is to the product of process claim 30. In addition to the double patenting rejection of the product claim 33, rejections on other references were made.[1] Since we affirm the double patenting rejection, we do not reach the additional rejections. Also, we think it advisable to note that, since there is no terminal disclaimer of record in this case, we do not have before us the *separate and distinct issue* of whether or not the relationship between appellant's prior patent claims and the instant claimed invention is such that a terminal disclaimer would permit issuance of the latter in a patent.

The invention here relates to the production of a kaolin [2] product, for inter

---

[*] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

[1] The other references are:

Brown      2,305,404      Dec. 15, 1942
Duke       2,920,832      Jan. 12, 1960

Mellor, Comprehensive Treatise on Inorganic and Theoretical Chemistry Vol. 6 (1925), p. 476.

[2] Kaolin is defined in Webster's New International Dictionary (1932), p. 1177, in part as:

* * * A very pure white clay, ordinarily in the form of an impalpable powder, used to form the paste of porcelain * * *. It is a hydrous silicate of aluminum, $H_4Al_2Si_2O_9$ * * *. Kalolinite is defined therein as "pure kaolin, occurring in white crystalline scales."

alia as a paper coating pigment, of a higher order of whiteness and brightness than has previously been attainable from secondary kaolin deposits,[3] such as are found in central Georgia. Whiteness refers to the uniformity of reflectance throughout the visible spectrum and is determined by a comparison of the per cent reflectance at 400 to that at 700 millimicrons wavelength. The whiteness of a kaolin is also expressed in terms of a point scale called the "Whiteness Index," the lower value indicating whiter kaolin. A publication [4] submitted by applicant on request for reconsideration indicates the following comparative values for English and a representative Georgia (domestic) kaolin:

Whiteness index (Diff. Refl. at 700 m$\mu$–400 m$\mu$.)
|  |  |
|---|---|
| Domestic (lower value indicates whiter) | 20–16.1 |
| English (lower value indicates whiter) | 13.9–9.5 |

In contrast, brightness is the relative per cent reflectance at 457 millimicrons, in the short wavelength (violet) end of the spectrum. The instant application states:

> * * * It is unfortunately true that the kaolins from Central Georgia are characterized by a deficiency of reflectance at the short wavelength (i. e., the violet) end of the spectrum. This fact causes them to appear "cream colored" by comparison with some other whiter pigments, such as precipitated calcium carbonate, blanc fixe, and certain high-grade imported kaolins, e. g., those from England. * * *

By appellant's method a Georgia kaolin can be upgraded to a whiteness index of 11.1, which will be recognized to be midway in the range of English clays. This improvement was stated before the board on reconsideration to be "almost 70% of the difference between what were the best and poorest clays at the time the invention was made."

Appellant set out in the specification two prior methods of improving whiteness and brightness: chemical bleaching treatments, and selection (classification) of the very *small* particles of clay:

> * * * Various and extensive research efforts have resulted in process refinements so that some of the naturally discolored kaolins can be whitened and brightened by various processings, including chemical treatments. It has been repeatedly found, over the years, that while known chemical bleaching treatments can produce improvements in whiteness, up to a point, there is definite limitation to the extent to which this color improvement can be carried, regardless of intensity of treatment.
>
> * * * * * *
>
> It has been already shown, as for example in U. S. Patent #2,524,816, that kaolins of improved brightness can usually be attained by the classification of the crude clays into finer and finer

3. Appellant's brief explains that:
   * * * Pure kaolin is white, and "primary" kaolin which has not moved from the original location of the feldspar from which it degenerated sometimes has a high degree of whiteness. The English china clays are primary kaolins (T.R. 59). "Secondary" kaolin is that which has been washed away from its place of origin and has collected at some other location. Such kaolin is invariably stained by surface coatings of colored compounds, usually oxides of iron and titanium. American clays, particularly Georgia kaolins, are secondary kaolins (T.R. 55). The discoloration can usually be partly reduced by chemical bleaching, but the titanium stains cannot be removed by chemical means without damaging the kaolin itself (T.R. 4, 63). * * *

4. TAPPI Monograph Series, No. 20. Paper Coating Pigments, Ch. V, Clay (Kaolin), (1958) p. 69, published by the Technical Association of the Pulp and Paper Industry.

particle size fractions up to a certain point, viz., less than 0.25μ. The brightest clays attainable have usually been obtained by selecting that fraction of particles between diameters 0.25μ and 2.0μ. On the other hand, particles coarser than about 2μ generally yield a product of inferior color. This relationship, while not invariably true, is generally so.

In contrast to those prior methods, appellant's invention is disclosed as follows:

I have now discovered that if instead of selecting the fine particles from a classifying operation, I select the coarse particles—that is, those coarser than about 2μ diameter—and subject them to a process of delamination by extrusion under controlled critical conditions of moisture content and pressure, I obtain a product from these delaminated coarse kaolin particles which is surprisingly brighter and whiter than I can obtain from the naturally fine particles themselves.

In addition, while the mere mechanical disintegration of the large kaolin particles produces, by itself, an exceptionally bright product, this product is susceptible to further chemical color improvement, and the combination yields a product of unique brightness and whiteness.

The "coarse" particles of larger than 2 microns diameter were previously known

to be vermicular stacks of plates.[5] The individual plates of the stacks are separated, in appellant's own terms, or "delaminated," by the plastic shearing pressure in the extrusion step to expose the unstained interior faces of the individual plates.[6]

Representative claims 30 and 33 on appeal read:

30. A method of improving the whiteness of washed kaolin comprising the steps of:

(1) forming a slurry of said kaolin,

(2) fractionating the kaolin to obtain a coarse particle fraction having at least about 80% kaolin stacks of greater than two microns equivalent spherical diameter,

(3) adjusting the moisture content of this coarse particle fraction to a percentage low enough to require at least about 350 psi pressure to extrude the mass through a 3/16" hole in a nonpowdery form,

(4) subjecting the fraction to plastic shearing equivalent to that achieved by extruding the fraction at 350 psi pressure through a 3/16" hole, and

(5) fractionating the resulting mass following plastic shearing to recover therefrom particles of less than two microns equivalent

5. Appellant's application states:
Finer than 2μ, the particles are basically hexagonal crystal-plates roughly one tenth as thick as they are long, or else thin, face-to-face aggregations thereof. Larger than the 2μ dimension, they are stacked aggregations of these component plates, usually in a sort of superposed configuration of mosaic sheets of the tiny plates. These are the particles which are referred to as "stacks." This discovery, while relatively recent, is amply documented and illustrated in the literature pertaining to clay technology; for example, "The Mechanism of Gloss Development in Clay Coated Sheets" by Woodward and Lyons, Tappi Vol. 34, #10, October 1951, pages 348 through 442; also Koenig and Lyons, "Correlation of Ka-

olinite Crystal Shape with Particle Size and Some Effects on Ceramic Behavior," Ceramic Age, July 1955.
To the same effect are parts of the Billue patent, and the TAPPI Monograph, supra, note 4.

6. Mellor, supra, note 1, states in this connection:
* * * The [kaolinite] crystals may occur in aggregates of plates piled one above the other so that by screwing the cover-glass under slight press., it is possible to spread out the plates much as if a pack of cards were spread out fanwise by pressing and screwing with the thumb at the other end. Curious vermicular—vermis, a worm—aggregates or rouleaux of plates, Fig. 109, have been found in many clays.

spherical diameter characterized by a predominance of plate-like particles of increased whiteness as compared with the original clay.

33. As a new article of manufacture, a kaolin product resulting from the practice of the method of claim 30 and characterized by being whiter by at least two points in whiteness than a fraction of comparable fineness of natural clay, said whiteness being measured by the difference between percentage of reflectance at 400 millimicrons and at 700 millimicrons as compared with the original clay.

The remaining appealed claims are process claims generally similar to claim 30.

The Lyons patent relates to a method of treating kaolin to increase the percentage suitable for use in paper coating and other uses requiring particles of small size such as 2 microns or less in equivalent spherical diameter (e.s.d.). It states that, although "probably every known device for the comminution of solid particles" has been tried at one time or another for that purpose, they have been so inefficient as to be impractical. It discloses that "surprising increases in particle fineness and decreases in the viscosity of kaolins" can be achieved by "extruding them under very high pressures and within very narrow and closely controlled limits of moisture content during the extrusion process."

Since the double patenting rejection was based on claims of the copending Lyons patent, representative claims thereof are reproduced below:

1. A method of materially reducing the average particle size of finely divided calcined kaolinitic clay which comprises making a clay-water mixture having a solids content in excess of about 65% and a moisture content sufficient to permit extrusion of the mixture through a $3/16''$ die aperture, and forcing said mixture through die apertures of approximately $3/16''$ at pressures of at least 350 pounds per square inch.

5. A method of materially reducing the average particle size of washed kaolinitic clay, which consists of making a clay-water mixture having a sufficient percentage of kaolinitic clay to require at least 350 p. s. i. to force it through a $3/16''$ aperture and a sufficient percentage of moisture to permit the mixture to be extruded through a $3/16''$ die aperture in a non-crumbly and non-powdery form, and subjecting said mixture to internal plastic shearing forces sufficient to increase by about 6% the percentage by weight of the particles in the mixture of a size not greater than $2m\mu$ equivalent spherical diameter by extruding the mixture under pressures of at least 350 p. s. i.

It is clear from the record that the step of "delamination by extrusion under controlled critical conditions of moisture content and pressure * * *" is attained by the patented Lyons process defined in the above-quoted representative claims. The instant specification states in this regard:

As is described in my co-pending Application #684,253, filed September 16, 1957, pursuant to which application Patent No. 2,904,267 was granted September 15, 1959, the only known practical and economic way whereby these plates can be split up is by extrusion of the stacks under extreme plastic-shearing pressure while the stacks are moistened by a percentage of water within a critical narrow limit.

Further, an affidavit submitted under Rule 132 during prosecution, to which we shall advert in more detail later, indicates specimens of clays prepared according to the appealed invention for comparison with prior art clays were "delaminated" according to the Lyons patented process. Thus the affidavit states:

THE SUPERSTRUSION

The clay, thus moisture-conditioned, was extruded through a multi-apertured die-plate by a screw-type power extruder, under conditions taught in U. S. Patent #2,904,267.

The same extrusion treatment was given to each specimen.

The Billue patent, filed after the appealed application, is a continuation-in-part of an abandoned application filed September 24, 1956, which date is prior to the instant application. Billue relates to increasing brightness and gloss of clay used for coating paper. This is done by first separating (classifying) the coarse from the fine clay, and then "fracturing," by means of a "Rafton" or "pug" mill, the coarse clay fraction to produce finer particles within the desired particle size range. Finally, the desired fine fraction is separated from the mass of "fractured" clay.

Before further detailing the Billue teachings, it is necessary to clarify a preliminary issue. The Billue patent nowhere mentions whiteness, although it does refer to beneficial properties of clay used for coating paper to be brightness, gloss and an "opacity-creating ability." However, the parent application does refer in one place to the whiteness property as follows:

> Although in the above examples a Rafton Mill was used to fracture the clay particles, somewhat analogous results may be obtained with a Waring blendor. The particles fractured by a Waring blendor are whiter than the original clay of corresponding particle size range. However, the relative proportion of clay that may be fractured is substantially less than that obtained with a Rafton Mill; for example, the percent of clay recovered as 78% finer than 2 microns is relatively smaller with a Waring blendor.

That teaching in the parent was not carried forward to the continuation-in-part which issued as the Billue patent here involved. Since we find it unnecessary to rely on that teaching, we thus do not reach the issue whether such a teaching, contained only in an abandoned parent *and* referred to in a patent, may be re-

lied on as a prior art disclosure as of the filing date of the parent.

As will appear in more detail below, the amount of "fines," particles of clay smaller than the well-recognized figure of 2 microns referred to above, that may be present in the coarse fraction to be treated, is said to be critical in the claimed process. Appellant limits the process to not more than 20% fines by such claim limitations as:

> * * * fractionating the kaolin to obtain a coarse particle fraction having at least about 80% kaolin stacks of greater than two microns equivalent spherical diameter * * *.

The Billue patent states:

> * * * In my process, I may use either coarse clay after removing the fines so that there are substantially no particles finer than 2 microns, or, with a little less brightening improvement, mined, coarse crude clay. However, the coarse clays that I use, irrespective of whether they are coarse crude clays or coarse clays obtained from classification, must have not more than 35% by weight particles below two microns.

The abandoned copending parent Billue application states in this regard that the "coarse clays may have as little as 18% of their material below 2 microns, or even less, and rarely have more than 35% by weight below 2 microns." That precise reference to an 18% figure does not appear in the patent, and appellant alleges that in the parent case the maximum was 50% [7] rather than 35%. As above with regard to whiteness, we do not find it necessary to rely on statements not carried forward to the patent; of course we do not rely on teachings having no support in the parent. We rely on the patent teachings having adequate foundation in the parent application, and agree with the board that:

> * * * As pointed out by the Examiner, there is clear basis, and a specific

7. That appears inaccurate, since the 50% figure noted in the Billue parent was with reference to the per cent solids in the slurry, not the per cent fines in the start-

ing fraction. Billue also refers in parent claims to 50% of fractured material in the *resulting* clay.

disclosure, in the Billue parent case for milling coarse kaolin particles of a size which meets the 20% limitation with respect to "particles of less than 2 microns in diameter," \* \* \*. We therefore consider the effective filing date of the Billue patent, with respect to the subject matter relied on by the Examiner, to be the filing date of the parent case, viz., September 24, 1956, under 35 U.S.C. 120.

Other teachings of Billue will appear in the context of the discussion of the rejection and the answer to appellant's contentions.

The examiner, in a statement reiterated by the board, accurately summarized the differences between the patented and appealed processes:

> \* \* \* The present claims only differ from the claims of appellant's patent in fractionating the kaolin to obtain a coarse fraction of which 80% of the kaolin particles are greater than 2 microns in diameter prior to extrusion thereof and fractionating the extruded mass. \* \* \*

We agree with that characterization. In substance, the process of the appealed claims is the patented process practiced on a coarse fraction of clay, the coarseness (no more than 20% fines) being alleged critical to the production of unexpectedly brighter and whiter fines. We observe that the patented process is *not* restricted to employment on any particular clay fraction. Thus, the question resolves itself into whether or not the process of classifying clay and using the coarse fraction of the classified clay in the patented process would be, in view of Billue, an obvious variation of the patented process which is not restricted to employment of an unclassified clay.

The examiner was of the opinion that:

> \* \* \* It is considered to involve an obvious choice to one skilled in the art to apply the fractionating steps of Billue to the analogous milling process claimed in the Lyons patent. Therefore, the present claims are considered to be an unpatentable variation or mod-

ification of the claims of appellant's patent. In re Kiekhaefer [49 CCPA 943, 299 F.2d 866], 779 O.G. 902, 132 USPQ 636. As to claim 32, Billue shows that it is old to chemically bleach kaolin.

The board agreed, stating:

> In our opinion, it would be obvious to prefractionate the coarse particles of Lyons in accordance with the teaching of Billue, both in his patent and in the parent case, to fractionate those coarse clays which have been previously discarded, and then to mill the coarse particles and recovering, by fractionating, kaolin particles of less than 2 microns in diameter.
>
> \* \* \* \* \* \*
>
> We therefore, consider the combination of the Lyons patent with the Billue disclosure in the parent case, as proper in order to show that the subject matter claimed herein is merely an unpatentable improvement over the subject matter already patented by appellant, in the light of the teaching of the prior art, i. e., Billue. In re Ockert, 44 CCPA 1024; 1957 C.D. 404; 722 O.G. 222; 245 F.(2d) 467; 114 USPQ 330, In re Ward et al., 43 CCPA 1007; 1956 C.D. 387; 711 O.G. 426; 236 F.(2d) 428; 111 USPQ 101.

Appellant's primary contention is that "there is no suggestion in either the claims or specification of the Lyons patent of the critical nature of the limitation of a maximum of 20% of particles below two microns requisite to produce high whiteness," and that absent the first step of prefractionation "there is little or no whiteness improvement produced by the process." It is also urged as significant that the Lyons patent does not use the term "delamination," and that it claims only a method of reducing particle size of kaolin and not a method for increasing the whiteness claimed here. Appellant contends further that Billue is directed to "increasing the brightness of clay, *not* the whiteness," and "to *fracturing* the clay, not to delamination."

It is our view that those objections treat the Billue reference and the Lyons patent claims independently, whereas the rejection is based on the combination. Although we appreciate that individual defects of the reference or patent claims can defeat the rejection, we do not find the rejection overcome by pointing out that one reference does not contain a particular teaching, when the reliance for that teaching was on another "reference." We find ample support for the conclusion that one skilled in the art would find it obvious to combine classification steps, as in Billue, with the patented process steps to produce improved fines. Billue's discovery is the *selection of a coarse fraction alone, rather than a fines fraction* as previously done, for processing to cause a reduction in size, by means conventionally used with unclassified clays ("Rafton" or "pug" mills). As with the patented Lyons' process, the percentage of fines is increased and gloss improved. We find nothing in Billue, nor does appellant so argue, indicating *the means* by which the stacks or vermicules are "fractured," as Billue descriptively terms it, is important. It is clear that Billue could utilize any means that increases the percentage of fines.

The key concept of Billue, the selection of a coarse fraction, is thus disclosed:

I have found how a clay of intermediate particle size range—that is, around 70–80% below 2 microns—may be greatly increased in brightness without in any way necessitating sacrificing softness. This is done by separating coarse clay from the natural or crude clay, and then fracturing this coarse clay to produce particles within the desired particle size range, and separating the desired fractured particles from the mass produced from the fracturing step.

Likewise that is the key concept that distinguishes the appealed process from the patented process. Thus, appellant's application states:

I have now dicovered that if instead of selecting the fine particles from a classifying operation, I select the coarse particles—that is, those coarser than about 2μ diameter—and subject them to a process of delamination by extrusion under controlled critical conditions of moisture content and pressure, I obtain a product from these delaminated coarse kaolin particles which is surprisingly brighter and whiter than I can obtain from the naturally fine particles themselves.

We do not find it fatal to the combination that Billue refers to what happens during the production of the brightened fines as "fracturing." The term "fracturing" in Billue is with reference not to the relied-on teaching of selection of coarse particles, but to what happens to the coarse particles during their reduction to fines. Billue gives a picture that "fracturing" is meant only as general shorthand and not as bindingly descriptive of what happens in producing from a coarse clay fraction an increase in particles finer than 2 microns with increased brightness as compared to unprocessed clay of the same size. Billue's description of the process in terms of result and his reference to the 2μ size, below which one in this art refers to plates and above which one refers to stacks, also fits that general picture. Nor is there any evidence that the Billue process actually breaks either the stacks or the individual plates along their axis rather than separating the stacks into individual plates. We do not find in that context the term "fracturing" to prevent one of ordinary skill from applying the key Billue teaching of selection of a coarse fraction to the Lyons process, or using the Lyons process on a coarse fraction of clay.

Nor do we think it material that the Lyons patent refers to "reducing the average particle size" rather than "delamination" of stacks as referred to in the appealed application. As noted above, both the appealed application and the affidavit show that *in fact* what happens during the extrusion is the same regardless of whether or not the reduction in average particle size is termed "delamina-

tion." [8]   That after-developed term is at best only somewhat more accurately descriptive of a state of fact of the earlier patented process.  Cf. In re Wilson, 311 F.2d 266, 50 CCPA 773.

We turn now to the allegation that the condition that not more than 20% fines be present in the coarse fraction is critical to the production of the improved whiteness and brightness.  We think that criticality has not been demonstrated, and that the Billue reference directs one in this art to such a condition for the specific purpose and with the expected result of increased brightness.

Regarding the percentage of fines, the solicitor has summarized the Billue examples as follows:

* * *  The eight examples of the abandoned parent application reappear as correspondingly numbered examples in the patent.[9]  Several of the tables associated with these examples indicate percentages of fines in the clays before fracturing, which information can be summarized as follows:

| TABLE | PROPORTION OF FINES BEFORE FRACTURING |
|---|---|
| I | (a)  17% under 10 microns |
|  | (b)   8% under  5 microns |
| [Table I, (a) and (b), both show "% finer than 2 microns 0."] | |
| III | 3% under  2 microns |
| V | 25% under  2 microns |
| VII | 4% under  2 microns |
| IX | 12% under  2 microns |
| XI | 14% under  2 microns |
| XIV | 4% under  2 microns |

It is evident that all but one of the coarse clays, viz. that of Table V, contained at least 80% kaolin stacks greater than two microns equivalent spherical diameter.  * * *

Appellant has not pointed to any error in that table, and indeed ignores all but the 35% upper limit of Billue.  Billue also notes that the coarse fraction may be selected to have "substantially no * * *" particles finer than 2 microns.

During prosecution appellant, submitted an affidavit that detailed measurements made of the brightness and whiteness of clay having various percentages of fines both above and below the "critical" 20% figure that was treated according to the claimed process.  The results were as follows:

| | BR. | W.I. |
|---|---|---|
| From Feed with Negligible Fines | 90.7 | 9.9 |
| From Feed with 10% Fines | 89.4 | 11.1 |
| From Feed with 20% Fines | 88.4 | 19.8 |
| From Feed with 30% Fines | 87.8 | 14.8 |
| From Feed with 45% Fines | 86.9 | 15.5 |

8.  In fact, appellant's brief at one point refers to the Lyons patent as "a secondary reference disclosing delamination of a nonfractionated clay."

9.  The Billue patent contains additional examples on which we do not rely.

"BR." is the brightness value in percent reflectance at 457 millimicrons wavelength, and "W.I." is the whiteness index. The measurements were recorded by a G.E. recording spectrophotometer, and the resultant graph shows five lines, separate at the short wavelength end (400 millimicrons) gradually merging into a single line at the long wavelength end (700 millimicrons). On petition for reconsideration, appellant submitted the appended graph of the results as showing the criticality of the 20% figure. The graph also contains two values of whiteness for Billue's *maximum values* that were apparently calculated, by an undisclosed method, from the comparable Billue brightness figures; no whiteness figures are calculated for the Billue examples above-noted that start with a coarse fraction having below 20% fines.

Appellant states in connection with the graph (references to the record omitted):

This graph simply charts the figures which are already in Exhibit A [the affidavit values quoted above] * *. It will be seen from the graph that there is a sharp change in the slope of whiteness index at about 20% showing a clear change in kind and not merely a change in degree. We have indicated on the graph the significant points of Billue patent 3,058,671 (35% fines) and Billue parent application Serial No. 611,757 (50% fines).[10] The tremendous significance of this change in kind is apparent from the comparison of whiteness indices which appear on page 69 of Monograph 20 of the Technical Association of the Pulp and Paper Industry [TAPPI] * * * where the Whiteness Index for both domestic and English clays is given. It will be noted that the whiteness for domestic clays is from the best at 16.1 to the poorest at 20.1 a range of only 3.9 points of whiteness index. When this is compared with the added improvement of 2.7 points between 20% to 10% fines

achieved by the Lyons invention it is at once evidence that a very significant contribution has been made. This improvement in whiteness is almost 70% of the difference between what were the best and poorest clays at the time the invention was made. A 70% improvement is certainly a significant improvement. * * *

The solicitor points out that the affidavit values (dots in appellant's appended graph) at each end of the curve are subject to question, and on recalculation arrives at a graph having no sharp break at the 20% fines point. That graph is also appended.

The solicitor then comments as follows (the computation in the solicitor's footnote 3 being omitted):

From the outset, it is apparent that the assumed "20% Fines" was really some value within a range of "about 20%–23%" * * *, that the larger 30% and "45%" blendings consequently also represented about a two percent spread each * * *, that the coarsest fraction "devoid" of fines was inherently vague for quantitative purposes, and that there are entirely too few empirical points to establish any criticality with reasonable certitude. More abstruse is appellant's error in concluding that a blending of 38 parts of the "20% fines" fraction with 20 parts of clay containing about 78% of fines yields a feed material containing about "45% of fines" * * *. Such blending actually yields a feed material containing 40% of fines, as can be verified by simple computation. * * * Correction of appellant's graph for that point alone will take considerable kink out of the curve, inasmuch as the 20, 30 and 40% points then tend to line up, relegating a more gradual bend in the curve to some zone below 20% (upper portion of curve as shown). One should also note that appellant has conveniently chosen 5% as "negligible"

10. Referring to footnote 7, supra, there is only one maximum value at 35% fines; the point, ▢, at 50% should not appear on appellant's graph. It is not clear to us where either a whiteness or brightness figure for "50%" is found in the Billue parent.

fines, thereby avoiding any negative gradient in the curve in its upper reach. Of course, such a gradient would be hard to explain physically. But then, it is just as likely that the 10% point should be off, to the same end. * * *

We are constrained to agree with that unrebutted commentary and graph of the solicitor as showing the 20% figure to be not persuasive of a criticality probative of non-obviousness of the entire claimed process in view of the Lyons patent claims and the teachings and examples of Billue. A conclusion of criticality simply cannot be reached on such clearly arguable and equivocal data.

The other major difference urged as an unexpected result probative of non-obviousness is the matter of whiteness and brightness. Both the Lyons patent and Billue are silent as to whiteness, and Billue alone refers to brightness. It is argued that the improvement in whiteness is unexpected and so significant as to permit issuance of a patent. We think not.

We think it evident that the Billue reference would direct one in this art to the claimed process because of the advantage of brightness alone. That expected advantage is indeed achieved. Appellant is left to argue that it is unexpected that whiteness *in addition to* brightness is improved. That there is an *additional* advantage, an increase in whiteness, accruing therefrom, is not on the facts here persuasive of non-obviousness of a process of applying the Lyons patented process, unlimited as to fraction, to a coarse clay fraction. The improvement in brightness neither teaches away from, nor is it inconsistent with an improvement in whiteness.

We noted in In re Graf, 343 F.2d 774, 52 CCPA 1206, that obviousness is not to be determined on the basis of purpose alone. In *Graf* we held that (343 F.2d at 777):

> While a selection of certain facts in this case tend to a conclusion of non-obviousness and others taken alone may show obviousness, the conclusion required under section 103 must be grounded on a weighing of all the facts.

The same weighing of *all the facts* is required where the rejection is founded on double patenting rather than on section 103. In view of the relationship between brightness and whiteness appearing from the record, we do not think this case to be so close on its facts as either the *Graf* case, or In re deMontmollin, 344 F.2d 976, 52 CCPA 1287.

Further, it is apparent from the record that the increase in whiteness here obtained is due entirely to the increase in reflectance at the shorter wavelength end of the wavelength curve. As an example is appellant's Fig. 2:

Similarly, the affidavit in measuring the brightness and whiteness for feed having respectively "negligible," 10%, 20%, 30% and "45%" fines indicates that the value at the longer wavelength end (700 millimicrons) of the curve is the same (95 ± .5%) for all the feeds. Only the shorter wavelength end of the curve is displaced upward as the percentage of fines in the starting material decreases. The TAPPI Monograph also indicates the known general nature of the reflectance curve to be upward from the short to long end of the spectrum. Thus it seems reasonable that an increase in brightness would be expected by one of ordinary skill in this art to be accompanied by some increase in whiteness, particularly where the starting clay has nearly the maximum reflectance at the long wavelength end of the spectrum. As appellant puts it, the kaolins from Central Georgia appear cream colored since they "are characterized by a deficiency of reflectance at the short wavelength (i. e., the violet) end of the spectrum." Although whiteness and brightness are not the same property, the increase in whiteness here does not appear to be so unrelated to an increase in brightness as to tip the scales of patentability in the face of the entirely expected increase in the properties of brightness and gloss.

We think also that it is significant to note that a fair reading of the application does not attach such significance to whiteness as compared to brightness as appellant urges before us. After a discussion of "commercial efforts" to improve brightness, the application notes that the matter of whiteness is "of collateral importance * * *."

The product-by-process claim 33 was also rejected on grounds of double patenting and that rejection was affirmed by the board. Appellant treats all the claims together. As this court re-

cently held in In re Taylor, 360 F.2d 232, 53 CCPA ——, relying on In re Bridgeford, 357 F.2d 679, 53 CCPA ——, a product-by-process claim is a product, not a process. Thus we shall treat claim 33 here separately, although for much the same reasons as given above we think the product of claim 33, as claimed to be produced by the process of claim 30, to be obvious from a consideration of the Lyons patent claims and Billue.[10] The only feature by which the product is said in fact to distinguish from Billue's lies in the use of the patented Lyons extrusion method on the selected coarse fraction. For reasons similar to those given above, we do not see that practice of the patented Lyons process on a coarse fraction to result in a non-obvious product. Although the product has improved brightness and results in a paper having improved gloss, as expected from both Billue and the Lyons patent, only the whiteness improvement is mentioned in the claim, and this property we have adverted to above. Of the improvement in the three properties, two are entirely expected, the other only somewhat less so. Even assuming the improvement in whiteness to be unexpected, we are not convinced the product is non-obvious upon weighing *all the properties*. *In re Graf*, supra; *In re deMontmollin*, supra.

In this connection appellant urges:

* * * Billue's practice, as stated in column 5, lines 15–18 (T.R. 191), results in "a higher viscosity than unfractured clay having the same particle size distribution from the same source. In addition, the fractured clay particles will require more casein adhesive for coating paper." The practice of the present invention results in a reduction in viscosity when the extrusion is carried out within the proper moisture limits and the requirement of casein or other adhesive is not in-

10. In view of our affirmance of double patenting rejection of claim 33, we need not pass on the contention of the solicitor that the reasons of appeal are insufficient to warrant review of the rejection of claim 33 as unpatentable over Billue,

Duke, Brown and Mellor. The solicitor notes that In re Baird, 348 F.2d 974, 52 CCPA 1747, prompts raising the matter, and he relies on In re Gruschwitz, 320 F.2d 401, 50 CCPA 1498.

creased, but on the contrary, usually reduced. \* \* \*

However, we fail to find reference to the viscosity property in the application. Similarly there is no mention of it in the affidavit, much less an actual comparison with products of Billue. Unsupported allegations in briefs on appeal of such differences are hardly persuasive of nonobviousness.

But assuming arguendo that undisclosed and unclaimed difference to be in fact true, we are again of the view that appellant misconceives the rejection as one looking to Billue as the source of the steps of reducing the particle size.

That is not the case. The reference in Billue to higher viscosity appears to be with reference to the property of dilatency of the clay *after* treatment.[11] On the other hand, there is some discussion in the Lyons patent disclosure with reference to viscosity control of the clay *prior to* the extrusion by the addition of deflocculating agents. The viscosities noted do not refer to clay at the same stage of processing. Thus, those teachings are neither comparable nor inconsistent.

For the foregoing reasons the decision of the board is affirmed.

Affirmed.

11. We assume arguendo that disclosure is available to appellant although it appears only in the patent. See *In re Wilson*, supra.

APPENDIX

Chart of Data
from
Exhibit-A Referred
to in
Lyons Affidavit

TAPPI -
Minimum Whiteness Index
English Clays

Billue Serial - 611757

Billue Pat. - 3058671

APPELLANT'S GRAPH

TAPPI
Whiteness Index Range
English Clays
(pg. 69)

Percent Natural Fines

Whiteness Index

SOLICITOR'S GRAPH

Revised Chart of Data from
Lyons' affidavit (R-25)
and Ex. A (R-21)
(Compare with R-49)

1st coarse fraction
with 20% fines ~ ●
23 % fines ~ x

Whiteness Index

← Examples I - VIII →
in Blue

Percentage Natural Fines

SMITH, Judge (dissenting).

Both references of record teach that the finer particle sizes produced the greater brightness in the coating. Appellant's prior patent No. 2,904,267, reduced the particle sizes of clay by extruding a plasticized clay through an extruder to shear the particles. The Billue patent No. 3,058,671, reduced the particle sizes of clay by "fracturing" the coarse clay to produce the smaller particle sizes desired. I agree with the majority that Billue discloses the selection of coarse particles. As stated by Billue:

I have found how a clay of intermediate particle size range—that is, around 70–80% below 2 microns—may be greatly increased in *brightness* without in any way necessitating sacrificing softness. This is done by separating coarse clay from the natural or crude clay, and then *fracturing* this coarse clay to produce *particles within the desired particle size range,* and separating the desired fractured particles from the mass produced from the fracturing step. [Emphasis added.]

I have emphasized in the above quotation the words "brightness," "fracturing" and "particles within the desired particle size range" because these terms have a meaning which it seems to me are misapprehended by the majority.

Certainly "brightness' and "whiteness" are quite different concepts in the pigmentation industries. One has but to observe the gloss (brightness) of a good grade of a black enamel surface and compare it with the dullness (lack of brightness) of a good grade of a "flat" white painted surface to appreciate the entirely different properties with which we are here concerned. The majority apparently chooses to disregard the foregoing observation for it states:

The other major difference urged as an unexpected result probative of non-obviousness is the matter of whiteness and brightness. Both the Lyons patent and Billue are silent as to whiteness, and Billue alone refers to brightness. It is argued that the improvement in whiteness is unexpected and so significant as to permit issuance of a patent. We think not.

The foregoing seems to me to state both an unwarranted and an unsupportable proposition in view of the facts of record.

Before discussing what it seems to me is a proper finding concerning the rejection in this case, it is desirable to state what it seems to me are the basic scientific concepts involved in this invention.

It is well known that as the sizes of particles are reduced, the specific surfaces in the resultant mass are increased. This was recognized and stated as long ago as 1934, by Professor Harry N. Holmes in his "Introductory Colloid Chemistry." In the ensuing 32 years, the art and science of colloidal chemistry has advanced so greatly that the current tendency is to forget the simple and elemental propositions which underlie it. I know of no area in which this is more true than in the art in question. While the use of clays was among mankind's earliest achievements, the recognition of the relationship of particle size to specific surfaces is relatively recent. The increase of total surface area is a basic fact and becomes an impressive factor when stated as Professor Holmes does at page 4 of the above referred to book.

"Surface increases enormously with subdivision," said Professor Holmes,

and all surface phenomena become greatly magnified. A cube, 1 cm. on edge, when subdivided into cubes 10 m$\mu$ on edge would possess a total surface of 6,000,000 sq. cm., and the number of particles would be $10^{18}$. The surface has been multiplied one million times. If the subdivision is carried to the lower limit of 5 m$\mu$ the free surface becomes almost one acre in extent. Consequently the importance of surface energy and of all surface properties becomes overwhelming. * * *

The importance of this fundamental observation seems to me to have been lost by the majority. If not lost, the majority has failed to appreciate its significance in the present setting.

The problem to which appellant addressed himself was how to *whiten* domestic clays. As pointed out in the specification in issue:

The secondary kaolin deposits of Central Georgia, U. S. A., are the basis of an extensive kaolin processing industry. Some millions of tons of kaolin are there produced annually and are refined by elaborate and modern processing techniques. One of the principal objects of these processes is to produce a kaolin pigment of a high order of whiteness and brightness. Various and extensive research efforts have resulted in process refinements so that some of the naturally discolored kaolins can be whitened and brightened by various processings, including chemical treatments. It has been repeatedly found, over the years, that while known chemical bleaching treatments can produce improvements in whiteness, up to a point, there is definite limitation to the extent to which this color improvement can be carried, regardless of intensity of treatment.

Appellant further points out that:

* * * Briefly, it might be pointed out that in speaking of whiteness, reference is had to the matter of uniformity of reflectance throughout the visible spectrum. It is unfortunately true that the kaolins from Central Georgia are characterized by a deficiency of reflectance at the short wavelength (i. e., the violet) end of the spectrum. This fact causes them to appear "cream colored" by comparison with some other whiter pigments, such as precipitated calcium carbonate, blanc fixe, and certain high-grade imported kaolins, e. g., those from England. This fact sometimes puts them to a marked disadvantage, and it would be extremely desirable if some way could be found whereby these Georgia clays could be made to be of equal or superior whiteness and brightness to the best of the imported clays as well as the other competing pigments above mentioned.

While appellant's earlier patent and Billue are concerned with increasing the "brightness" of clays, I find it most significant that improvement in "whiteness" of the treated clays is at best an unrecognized factor—both are concerned with particle size reduction of the clay to achieve improved "brightness." Neither teaches, nor appears to recognize the significance of other colors on the surfaces of the clay particles which each proposed to treat.

Thus appellant's prior patent utilizes all particle sizes of clays which he forms into a plastic mass by the addition of water and then "delaminates" by pressure extrusion processing. In fact, the fundamental purpose of the invention of this patent is to utilize *all* of the crude clay particle sizes and thus to increase the total yield of processed clays over that achieved by sedimentation classification and separation of the particle sizes greater than 2 microns in diameter.

Billue differs from the prior Lyons patent in two principal respects: (1) Billue processes the particles larger than 2 microns in diameter and (2) does so by "fracturing" them.

Billue describes what he means by the term "fracturing by milling." He states:

The phrase "fracturing by milling" in the claims refers to the fracturing of kaolinitic clay particles by milling, such as is effected, for example, by the use of pug mills (kneading) and Rafton mills (impact and/or shear) of the type shown in U. S. Patents 2,535,647 and 2,448,049, respectively, wherein the particles are subjected to rupturing or shearing forces which cause the kaolinitic clay particles that are treated (i. e., not more than 35% by weight finer than 2 microns) to have an increase of particles finer than 2 microns and greater brightness on the brightness scale as compared to unfractured clay of substantially the same particle size.

Thus, we see that the common concern stated in appellant's prior patent and in the Billue patent is the reduction in size of the clay particles larger than 2

microns in diameter, and by so doing to improve the "brightness" of a coating in which they were used. It seems to me, and here I disagree with the majority, that there is no fair teaching in either prior process that it could be expected to increase the *whiteness* of the processed clay.

Here we are dealing with a color phenomenon. The least skilled of week end painters has observed how little color, how very little indeed, is required to "tint" a pure white pigment (usually an oxide of Zinc or Titanium) dispersed in oil. Here, it seems to me, we must consider appellant's statement in the specification in issue that:

Much still remains unknown regarding the difference between these new "plates" and their corresponding natural "plates," and it is not certain why these new type "plates" are whiter. However, it is known that these sedimentary kaolins were deposited in prehistoric coastal lagoons some 50 million years ago. It is entirely probable that they have, therefore, been immersed in ferruginous and other potential discoloring solutions for millions of years. It is, therefore, probable that the faces of the natural fine kaolinite plates have long since become coated with thin, but tenacious, deposits of ions of a nature which would detract from the native whiteness thereof. Probably some of these surfacial contaminations do yield to the chemical bleaching treatment while others are not respondent thereto.

To the extent that a discoloration is present on the surfaces of the clay particles, to this extent it should be considered as a "tinting" pigment. The process of appellant's prior process retains *all* of this discoloration, and recalling the increased total surface phenomena referred to by Holmes, above quoted, the gross amount of surface discoloration would be related to the total area of surface involved. Thus, Lyons' prior patent by failing to recognize the importance of applying the process to material having less than 20% of particles below 2 microns did not achieve increased whiteness which appellant achieves by the invention here in issue.

But what of Billue who admittedly processes Clay particles of greater than 2 microns in diameter? Here it becomes necessary to consider what occurs in "fracturing" vis-à-vis "delamination." In "fracturing" by the process disclosed by Billue, all surface discoloration is broken up as the clay particles are reduced in size. More importantly, however, those discolored surfaces become tinting pigments which are dispersed throughout the "fractured" mass and act as a color toner.

Here and in appellant's earlier patent the "delamination" of the clay particles produced what appellant has described in the instant application as "different" plates. This is stated in the specification in issue as follows:

The delaminated "plates" are different from the natural plates found in the original kaolin. They are whiter and brighter in the unbleached form and they, furthermore, bleach to values of brightness and whiteness unattainable by similar treatment of the naturally occurring "plates." Electronmicrographic studies indicate that the delaminated plates and/or sheets (i. e., mosaics of edge-to-edge plates) tend to be longer and wider than are the corresponding naturally occurring ones.

Perhaps we can gain a clearer understanding of the technical problem here involved by considering that Lyons' prior patent retains a larger amount of the discolored surface materials than does Billue but he does not break it up and disperse it as completely as Billue necessarily does by his "fracturing by milling" process. Billue, on the other hand, by selecting clay of over 2 micron particle sizes incorporates less of the discolored surface materials but by thoroughly dispersing them in the mass achieves the maximum tinting effect.

The invention of the appealed claims perceptively avoids the shortcomings inherent in both appellant's prior patent and in Billue. The former by reducing the amount of discoloration resulting from the larger total surface area of the fines and the latter by retaining the discoloring materials on the edges of the individual delaminated clay plates so that it is found chiefly at the edges of the individual clay platelets which electron microscopic studies show are joined edgewise in the form of a "mosaic." Thus, the color impression is one of increased "whiteness" as the discoloring or tinting particles probably remain on the edges of the plates, and are joined with similar edges on adjacent plates so that only a small proportion of the total discoloring materials is to be seen.

Relatively simple though this concept is, I do not find it in appellant's prior patent either alone or when considered with Billue.

Thus, in short, the invention of the appealed claims is a different invention and achieves different results from either Lyons' prior patent or the Billue patent. The difference between Lyons' prior patent and the present invention is not found in Billue. I find no basis in the record for finding appellant here seeks to claim but an obvious variation on the invention claimed in his prior patent.

I therefore must disagree with the majority's treatment of this appeal.